1

2

3

4

5

6                          IN THE UNITED STATES DISTRICT COURT

7                       FOR THE EASTERN DISTRICT OF CALIFORNIA

8    CALIFORNIA SPORTFISHING
     PROTECTION ALLIANCE,
9

10             Plaintiff,                        CIV. NO. S-10-1801 GEB GGH PS

11        vs.

12   WILLIAM CALLAWAY,
     dba PARADISE READY MIX,
13

14             Callaway.                      FINDINGS AND RECOMMENDATIONS

15   _____/

16             Previously pending on this court's law and motion calendar for October 18, 2012,

17   were defendant Callaway's motion for summary judgment, filed August 16, 2012, and plaintiff

18   CalSpa's motion for partial summary judgment, filed September 20, 2012.  Callaway was

19   represented by Frederick Stephenson who appeared specially for this hearing.[1]  CalSpa was

20   represented by Erik Roper.  Having reviewed the papers in support of and in opposition to the

21   motions, the court now issues the following findings and recommendations.

22   \\\\\

23   \\\\\

24   _____

25        [1] Other than the special appearance at this hearing, Mr. Stephenson is not permitted to
     represent Mr. Callaway in this case unless he files a substitution of attorney for court approval.
26   See E. D. Local Rule 182(g).  Mr. Stephenson may not associate in as counsel because Mr.
     Callaway is not an attorney of record.  See id., 182(i).

                                               1

BACKGROUND

This action was filed on July 13, 2010, and it is proceeding on the amended complaint, filed June 21, 2011.  California Sportfishing Protection Alliance ("CalSpa") is proceeding as a "citizen enforcer," under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, alleging that William Callaway, dba Paradise Ready Mix, Inc. ("PRM") is continuing to violate the terms of the National Pollutant Discharge Elimination System (NPDES) Permit based on storm water discharged to a "wash" at the border of the cement facility from Callaway's ready mix concrete facility in Paradise (hereinafter "Facility").  In addition to these alleged violations, CalSpa further alleges that Callaway failed to implement the required Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants, and that he failed to develop and implement an adequate Storm Water Pollution Prevention Plan and adequate Monitoring and Reporting Program.  CalSpa seeks civil penalties, injunctive relief and costs.

DISCUSSION

I. Legal Standard

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when it is demonstrated that there exists "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita, 475 U.S. at 585-86.  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Matsushita, 475 U.S. at 586.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Anderson, 477 U.S. at 248.

In the endeavor to establish the existence of a factual dispute, the non-moving party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  The evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor.  See Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).  To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita, 475 U.S. at 586-87 (internal citation and quotation omitted).

\\\\\

\\\\\

II. Evidence Presented

    A. Requests for Admissions

        By order of May 31, 2012, Requests for Admissions ("RFAs") numbered 1 through 16, and 19 through 22 were deemed admitted. (Dkt. no. 86.) The conclusive effect of these admissions, once ordered admitted, is well established. Once admitted, requests for admissions are "conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Although the court has discretion to grant relief from admissions, it can do so only when "(a) 'the presentation of the merits of the action will be subserved,' and (2) 'the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.'" Conlon v. U.S., 474 F.3d 616, 621 (9th Cir. 2007), *quoting* Fed. R. Civ. P. 36(b). Both factors must be considered. Id. at 622. This court's order of May 31, 2012, outlined this authority and more. The undersigned based the decision to deem these matters admitted on a record filled with Callaway's long history of delay in discovery, particularly in responding to the instant RFAs. Callaway never moved to withdraw the admissions. Rather, CalSpa moved for an order deeming them admitted. Although Callaway was permitted the opportunity to oppose that motion, he focused not on the factors listed above, but on arguing the merits of the case and excusing himself from responding due to his hip surgery. Although he made a very limited attempt to oppose the motion, the court found that it was too little, too late. Based on Callaway's obfuscative behavior and disobedience of prior court orders which had permitted him further responses to the RFAs, the court thoroughly analyzed the Rule 36(b) factors and ordered the matters admitted as a sanction. That May 31st order was in effect a denial of a motion to withdraw admissions, to the extent Callaway's opposition could have been construed as such. Therefore, these matters have already been conclusively established. In the absence of any disputed issue of material fact, this court can properly recommend summary judgment based on these RFAs. See Conlon, 474 F.3d at 621.

1    The Requests for Admissions which have been deemed and ordered admitted, are

2 reprinted here:

3 REQUEST FOR ADMISSION NO. 1:

4 That the FACILITY is subject to the GENERAL PERMIT.

5 REQUEST FOR ADMISSION NO. 2:

6 That STORM WATER flowing from the FACILITY is discharged to NAVIGABLE

7 WATERS.

8 REQUEST FOR ADMISSION NO. 3:

9 That STORM WATER ASSOCIATED WITH INDUSTRIAL ACTIVITY is discharged

10 from the FACILITY.

11 REQUEST FOR ADMISSION NO. 4:

12 That industrial activities at the FACILITY include the manufacturing of ready mix concrete,

13 the storage, handling and sale of various aggregate materials, and the use, storage, and

14 maintenance of heavy machinery and motorized vehicles, including trucks used to haul materials

15 to, from and within the FACILITY.

16 REQUEST FOR ADMISSION NO. 5:

17 That the FACILITY falls within the Standard Industrial Classification ("SIC") Code for

18 "Ready-mixed Concrete", i.e., SIC Code 3273.

19 REQUEST FOR ADMISSION NO. 6:

20 That hazardous materials are received, handled, stored at, and transported from and within,

21 the FACILITY.

22 REQUEST FOR ADMISSION NO. 7:

23 That some of the fuels or oils stored or used at the FACILITY may come into contact with

24 STORM WATER at the FACILITY.

25 REQUEST FOR ADMISSION NO. 8:

26 That wastes generated during the processing of the various aggregate materials used in the

1   manufacturing of concrete may come into contact with STORM WATER at the FACILITY.

2   REQUEST FOR ADMISSION NO. 9:

3   That wastes generated during maintenance activities at the FACILITY may come into

4   contact with STORM WATER at the FACILITY.

5   REQUEST FOR ADMISSION NO. 10:

6   That soil erodes and comes into contact with STORM WATER at the FACILITY.

7   REQUEST FOR ADMISSION NO. 11:

8   That at any time between May 14, 2005 and the present, samples of STORM WATER

9   discharged from the FACILITY contained total suspended solids in concentrations greater than

10   100 mg/L.

11   REQUEST FOR ADMISSION NO. 12:

12   That at any time between May 14, 2005 and the present, samples of STORM WATER

13   discharged from the FACILITY contained specific conductivity in concentrations greater than

14   200 imhos/cm.

15   REQUEST FOR ADMISSION NO. 13:

16   That at any time between May 14, 2005 and the present, samples of STORM WATER

17   discharged from the FACILITY contained a pH level either below a pH level of 6.0 or in excess

18   of a pH level of 9.0.

19   REQUEST FOR ADMISSION NO. 14:

20   That water from the rinsing or washing of vehicles, equipment, buildings, or pavement at the

21   FACILITY is discharged from the FACILITY.

22   REQUEST FOR ADMISSION NO. 15:

23   That at any time between May 14, 2005 and the present, leaks or spills of POLLUTANTS

24   have occurred in areas exposed to STORM WATER at the FACILITY.

25   REQUEST FOR ADMISSION NO. 16:

26   That the STORM WATER pollution management practices or treatment technologies

1    implemented by YOU at the FACILITY are the only STORM WATER pollution management

2    practices or treatment technologies that have been considered by YOU for implementation at the

3    FACILITY.

4    ...

5    REQUEST FOR ADMISSION NO. 19:

6    That Exhibit C is a true and correct copy of YOUR 2007-2008 ANNUAL REPORT for the

7    FACILITY.

8    REQUEST FOR ADMISSION NO. 20:

9    That Exhibit D is a true and correct copy of YOUR 2006-2007 ANNUAL REPORT for the

10    FACILITY.

11    REQUEST FOR ADMISSION NO. 21:

12    That Exhibit E is a true and correct copy of YOUR 2005-2006 ANNUAL REPORT for the

13    FACILITY.

14    REQUEST FOR ADMISSION NO. 22:

15    That Exhibit F is a true and correct copy of YOUR 2004-2005 ANNUAL REPORT for the

16    FACILITY.

17    (Dkt. no. 94-1, Roper Decl., Ex. D at 5-8.)

18            B.  Other Evidence

19            According to the declarations of CalSpa's Executive Director, Bill Jennings, and

20    its Federal Energy Regulatory Commission Projects Director and Water Rights Advocate, Chris

21    Shutes, CalSpa has 2000 members who use the Sacramento San-Joaquin Delta, including the

22    waters at issue in this case, for recreational and other purposes on a continuing and ongoing

23    basis.  (Dkt. no. 62, Jennings Decl., ¶ 2.)  CalSpa acts on behalf of its members to protect their

24    interests in these pursuits.  (Id. at ¶ 4.)  Jennings has been a member for thirty years and regularly

25    uses the Delta and its tributary waters.  (Id. at ¶ 23.)  He states, "I believe that pollution from

26    Defendants and other dischargers has degraded the beauty and other values of these waters,

1   curtailing the enjoyment and use of them by me and others like me who appreciate the natural

2   environment." (Id. at ¶ 24.)  It is his opinion that reducing the discharge of pollution from

3   Callaway's facility will result in a healthier river ecosystem and provide more opportunities for

4   him and others who fish, observe wildlife and use these waters for recreation.  (Id. at ¶ 27.)

5   Shutes is a member who has fished and participated in other recreation in the Butte Creek area

6   for five years.  (Dkt. no. 63, Shutes Decl., ¶ 2.)  Honey Run Creek, as a tributary to Little Butte

7   Creek, which is a tributary to the Sacramento River, "has important restoration potential for

8   salmon and steelhead."  (Id. at ¶¶ 3, 5.)  Shutes has noticed a significant decline in fishing

9   activities in the Sacramento River and Delta over the last two decades, and has been concerned

10  about pollution discharge from Callaway's facility and others.  (Id. at ¶¶ 6, 7.)  He rarely fishes in

11  these waters now due to pollutants from Callaway and other dischargers which he believes have

12  contributed to a number of "fishkills" and harm to other animals in this habitat.  (Id. at ¶¶ 10-12.)

13  He concludes with his opinion that reducing pollution from Callaway's facility will improve the

14  water quality of Honey Run Creek, Little Butte Creek and the Sacramento River and Delta,

15  thereby providing more opportunities for him and others to use these waters for recreation.  (Id.

16  at ¶ 14.)

17          Defendant has produced three affidavits concerning his cessation of operations at

18  the Facility, and other matters in which he attempts, in part, to ignore his conclusive admissions.

19  Callaway states that Paradise Ready Mix ceased doing business on November 19, 2010.[2]  (Dkt.

20  nos. 88 and 89, Callaway Aff., ¶ 7.)  Callaway has observed that since Mr. McGregor started

21  renting the property, the batch plant, conveyor system and equipment used in making concrete

22  have been removed from the property, as has equipment owned by Feather River Concrete,

23  which also had equipment on the site.  (Id. at ¶¶ 10, 11, 12.)  Callaway states that during the time

24  he operated the Facility, the subject property had no flowing water connected to it, and that no

25

26          [2]  The Affidavit states that the last sale by Paradise Ready Mix was on November 19,
    2012; however, this year appears to be a typographical error.  (Id. at ¶ 8.)

8

1  storm water or non-storm water ever collected at this site.  (Id. at ¶¶ 14, 15.)

2  Callaway's affidavit states: "there was no discernable discharge point, i.e. a pipe, culvert, ditch or

3  other such means where storm water and non-storm water was collected and/or discharged..."

4  (Id. at ¶ 16.)   Callaway also states that there were intermittent springs that flowed at certain

5  times of year but they did not come into contact with the Facility and the Facility did not

6  discharge into these springs.  (Id. at ¶¶ 18, 19.)  At no time was there a discharge of water from

7  the Facility into Honey Run Creek or any body of water.  (Id. at ¶ 20.)

8          Rick McGregor states that he has been the tenant at the subject property since

9  April 1, 2012, and has not made or sold any concrete from this location since that date.  He has

10  also removed the "concrete batch plant, conveyors and other equipment that would be required to

11  manufacture concrete from this location." (Dkt. no. 88, McGregor Aff., Ex. 3, ¶¶ 7, 8.)

12  According to this affidavit, Mr. Callaway removed a non-operating truck and a few other pieces

13  of equipment since McGregor has been on the site.  (Id. at ¶ 9, 10.)

14          The Gaylord Affidavit states that his business, Gaylord Enterprises, has been a

15  "renter" at the subject property from 1995 through the date of the affidavit, July 17, 2012.  He

16  states that he operated his business with Bill Callaway at this location until mid-November, 2010,

17  when Callaway ceased producing concrete from this location.  (Dkt. no. 88, Gaylord Aff., Ex. 2.)

18          Callaway obtained coverage under the General Permit on approximately June 30,

19  1997 when he filed his Notice of Intent to Comply With The Terms of the General Permit to

20  Discharge Storm Water Associated with Industrial Activity ("NOI").  (Roper Decl., Ex. A.)

21          Defendant's Annual Reports for the Facility for the following years are not

22  disputed: 2004-2005 (Roper Decl., Ex. D, RFA 22), 2005-2006 (Id., RFA 21), 2006-2007 (Id.,

23  RFA 20), 2007-2008 (Id., RFA 19), 2008-2009 (Roper Dec., Ex. E), 2009-2010 (Id., Ex. F),

24  2010-2011 (Id., Ex. G.)  It is also not disputed that Defendant did not analyze samples of storm

25  water for iron or other toxic chemicals or pollutants discharged from the Facility during the

26  aforementioned years for which reports were submitted.  (Id., Exs. D, E, F, G.)

1           On July 20, 2005, the Regional Board sent a Notice of Violation of the General

2   Permit to defendant's Facility.  (Roper Decl., Ex. J.)  The Notice informed defendant that he had

3   failed to "implement and maintain appropriate BMPs (best management practices).  (<u>Id.</u>)  On

4   December 15, 2009, the Regional Board sent defendant a letter entitled, "Storm Water Sampling

5   and Analysis Results."  (<u>Id.</u>, Ex. H.)  The letter referred to the annual report which indicated that

6   storm water from the Facility "exceeded US EPA benchmark values for certain parameters."  The

7   letter informed defendant: "[t]he levels of pollutants in your storm water samples indicate that

8   the current BMPs implemented at your site are not sufficient to reduce pollutant concentrations

9   below benchmark levels."  (<u>Id.</u>)  CalSpa's consultant inspected the Facility on February 29, 2012,

10   and noted "the absence of any structural controls needed to properly manage storm water flows

11   and large piles of concrete waste that were not in compliance with the Clean Water Act."  (Dkt.

12   no. 64, Lane Decl., ¶ 13.)

13           Despite attempting to cease business, Callaway did not file a completed Notice of

14   Termination ("NOT").  A letter from the Regional Board to Callaway, dated May 31, 2011,

15   advised Callaway that his permit coverage was not terminated due to his failure to completely fill

16   out the NOT form.  (Dkt. no. 94, Roper Decl., Ex. B.)  This letter advised Callaway that as of this

17   date, he was still covered under the General Permit and any storm water discharged from the

18   Facility would be subject to the terms of the General Permit.  (<u>Id.</u>)  According to the Roper

19   Declaration, the State Board's website permits anyone to check the status of permit coverage for

20   any facility that has been covered under the General Permit and that as of September 20, 2012,

21   Callaway's Facility was listed on the website as "active."  (<u>Id.</u>)  Among the terms of the General

22   Permit is the provision: "[s]hould the NOT be denied, facility operators are responsible for

23   continued compliance with the requirements of this General Permit."  (Dkt. no. 95, RJN, Ex. A,

24   Provision 9.)

25   \\\\\

26   \\\\\

1    III.  CalSpa's Request for Judicial Notice

2            CalSpa requests judicial notice of their Exhibits A, B, C, and D which are a State

3    Water Resources Control Board (State Water Board) Water Quality Order and General Permit

4    Waste Discharge Requirements, a United States Environmental Protection Agency Storm Water

5    Multi-Sector General Permit for Industrial Activities, and two unpublished judicial opinions.

6    These documents are referenced in connection with CalSpa's motion for summary judgment.  All

7    of these judicial and quasi-judicial documents are susceptible of judicial notice and the

8    undersigned grants CalSpa's request in this regard.  See Smith v. Duncan, 297 F.3d 809, 815 (9th

9    Cir. 2002) *abrogated on other grounds*, see Moreno v. Harris, 245 Fed. Appx. 606, 2007 WL

10   2316321 (9th Cir. Aug. 14, 2007).

11   IV.  Callaway's Motion for Summary Judgment

12           A.  Standing[3]

13           Callaway argues that CalSpa cannot provide any facts to meet the elements

14   required for standing, including injury in fact, causation, and redressability.

15           CalSpa contends that it meets the requirements of organizational standing, that the

16   violations are ongoing, and that its members' injuries will be redressed by a decision in its favor.

17           "'There is no question that an association may have standing in its own right to
18           seek judicial relief from injury to itself and to vindicate whatever rights and
             immunities the association itself may enjoy.'"

19   American Civil Liberties Union, Nev. v. Heller, 378 F.3d 979, 984-85 (9th Cir. 2004), *quoting*

20   Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197 (1975).

21           With respect to associational standing:

22           An association has standing to bring suit on behalf of its members when its
             members would otherwise have standing to sue in their own right, the interests at
23           stake are germane to the organization's purpose, and neither the claim asserted nor
             the relief requested requires the participation of individual members in the
24           lawsuit.

25   ───────────────────────

26           [3]  As this issue is common to both parties' motions for summary judgment, it will be
     addressed once only.

Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 181, 120 S.Ct. 693, (2000).  See also Western Watershed Project v. Kraayenbrick, 620 F.3d 1187, 1197 (9th Cir. 2010).

"[A]n organizational plaintiff can either assert standing on its own behalf or standing on behalf of its members."  Environmental Protection Information Center v. Pacific Lumber Co., 469 F.Supp.2d 803, 814 (N.D. Cal. 2007).

> In order to satisfy the standing requirement of Article III, an individual plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the Callaway; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

Id., quoting Laidlaw, 528 U.S. at 180-81, 120 S.Ct. 693; Sierra Club v. Morton, 405 U.S. 727, 734-41, 92 S.Ct. 1361 (1972).

1.  Injury in Fact

Here, Callaway argues that CalSpa cannot show injury in fact with evidence that any discharges of toxic substances caused "detrimental physiological responses in human, plant, animal, or aquatic life."  Callaway's only argument in this regard, as emphasized by his affidavit, is that there is no body of water flowing anywhere near his property and that there was no flowing water leaving his property which could have carried toxins into navigable waters.

CalSpa, on the other hand, has provided the declarations of its members, Jennings and Shutes, which set forth their use and enjoyment of the waters and the detrimental effect of the pollutants on their recreational opportunities.  See Evidence Section supra.  Defendant did not object to these declarations, and has provided no argument or evidence to refute them.  The declarations are therefore undisputed and demonstrate that these members suffered injury in fact.

\\\\\

\\\\\

\\\\\

2.  <u>Whether Violations are Ongoing</u>

Callaway argues that Paradise Ready Mix ceased doing business on November 19, 2010.[4]  (Dkt. no. 88, Callaway Aff., ¶ 7.)  Callaway argues that because he ceased doing business, past injuries are not redressable by a favorable decision.  He has submitted the affidavits of Rick McGregor and David Gaylord in support of his cessation of operations on the stated date.  <u>See</u> Evidence Section *supra*.

With his quoted reference to <u>San Francisco Baykeeper, Inc. v. Moore</u>, 180 F.Supp.2d 1116, 1122 (E.D. Cal. 2001), Callaway himself concedes that  "a citizen plaintiff may prove ongoing violations 'either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.'" (citations omitted).[5]

In this case, there is evidence from the conclusive admissions that the violations continued after July 13, 2010, the date the complaint was filed, and did not cease until at least after the date Callaway contends that he ceased operating the Facility in November, 2010.  Therefore, plaintiff has met its burden to show ongoing violations by establishing the first factor.

CalSpa contends that Callaway has not established that the violations have ceased.  The undisputed facts are that Callaway obtained coverage under the General Permit on approximately June 30, 1997 when he filed his NOI; however he has not filed a NOT which is a prerequisite to cessation of an industrial facility's coverage under the General Permit.  In support, CalSpa has submitted the May 31, 2011 letter from the Regional Board to Callaway, which informed him that his permit coverage was not terminated because he had failed to completely fill out the NOT form.  (Dkt. no. 94, Roper Decl., Ex. B.)  According to this letter, Callaway was

---

[4]  The Affidavit states that the last sale by Paradise Ready Mix was on November 19, 2012; however, this year appears to be a typographical error.  (<u>Id.</u> at ¶ 8.)

[5]  Callaway confuses the issue of ongoing violations with the issue of redressability, citing <u>San Francisco Baykeeper</u> in his section addressing redressability.

1  still covered under the General Permit and any storm water discharged from the Facility was

2  subject to the terms of the General Permit.  (Id.)  The State Board's website confirms that as of

3  September 20, 2012, Callaway's Facility was listed as having an "active" General Permit.  (Id.)

4  The General Permit provides in part that "[s]hould the NOT be denied, facility operators are

5  responsible for continued compliance with the requirements of this General Permit."  (Dkt. no.

6  95, RJN, Ex. A, Provision 9.)

7          The aforementioned evidence is not disputed by Callaway.  Because the General

8  Permit requires that a NOT be completely filled out, Callaway's evidence attempting to rebut his

9  continuous use of the Facility is insufficient to overcome the terms of the General Permit.  Since

10  Callaway continues to be the de jure operator of the Facility until the NOT is properly filed, and

11  the Regional Board approves the NOT and terminates him as operator of the Facility under the

12  General Permit, Callaway remains responsible for pollutants discharged in violation of the

13  General Permit.

14          As CalSpa explained at hearing, the prerequisite that the Regional Board approve

15  the NOT is important because otherwise operators could abandon the property and the regulating

16  board or agency would not know who the responsible operator is.  In City of Mountain Park,

17  Georgia v. Lakeside at Ansley, LLC, 560 F.Supp.2d 1288, 1297 (N.D. Ga. 2008), the court held

18  that a NOT was not properly submitted according to the requirements of the General Permit, and

19  therefore until a NOT is received by the proper authority, "the permittee's obligations and

20  liability continue indefinitely."  The court noted that summary judgment was possible in the

21  future if defendants could submit evidence to conclusively establish "that all of the relevant

22  NPDES permits were in fact properly terminated before the complaint was filed."  (Id. at 1299.)

23  See also Idaho Consv. League v. Atlanta Gold Corp., 844 F. Supp. 2d 1116, 1132-1134 (D. Idaho

24  2012).

25          Furthermore, the fact that Callaway did not cease operations until after the

26  complaint was filed against him is noteworthy.  "A change of activity by a defendant under the

threat of judicial scrutiny is insufficient to negate the existence of an otherwise ripe case or

controversy." Armster v. U.S. Dist. Court for Cent. Dist. of California, 806 F.2d 1347, 1357 (9th

Cir. 1986). See also Environmental Protection Information Center v. Pacific Lumber Co., 430

F.Supp.2d 996, 1003-1005 (N.D. Cal. 2006) (finding that defendant had "heavy burden" to prove

mootness, and the NOT had to be filed *and* approved by the Regional Board in order to terminate

the permit.)

Therefore, CalSpa prevails on the issue of continuing violations.  Nevertheless,

the court finds that the General Permit and failure to file a NOT are determinative on the issue of

liability for the instant summary judgment motions only, and this issue may be revisited later in

regard to the remedies portion of this case.[6]

3. Redressability

Callaway argues that because the injuries are wholly past injuries, they are not

redressable.

CalSpa contends that Callaway has failed to implement BAT and BCT, an

adequate storm water pollution prevention plan, and an adequate monitoring and reporting

program.  If he were to comply with these requirements, the use and enjoyment of the navigable

waters in that area, including Honey Run Creek, Little Butte Creek, Butte Creek, and the

Sacramento River and Delta would be improved to the benefit of CalSpa members.  (Jennings

Decl., ¶¶ 26-27; Shutes Decl., ¶¶ 13-14.)  CalSpa contends that civil penalties against Callaway

will deter him from violating the CWA in future.

The Jennings and Shutes declarations are not disputed.  Pursuant to Laidlaw, 528

U.S. 167, 186, 120 S.Ct. at 706-07, civil penalties encourage discontinuation of current

violations and deterrence from committing future violations.  Therefore, having established this

---

[6] As explained *infra*, one event is sufficient to constitute intermittent or sporadic violations which are considered ongoing until it is determined that there is no real likelihood of repetition.  Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 172 (4th Cir. 1988).

1  final factor, the court finds that CalSpa has standing.

2       B.  <u>Violation of CWA After the Filing of the Original Complaint</u>

3           Although the issue of ongoing violations is pertinent to redressability in the

4  standing context, as discussed *supra*, it is also pertinent to the merits.

5           On the matter of proving ongoing violations, we agree with the
            Fourth Circuit's recent decision on remand from <u>Gwaltney</u> that a
6           citizen plaintiff may prove ongoing violations "either (1) by
            proving violations that continue on or after the date the complaint
7           is filed, *or* (2) by adducing evidence from which a reasonable trier
            of fact could find a continuing likelihood of a recurrence in
8           intermittent or sporadic violations." <u>Chesapeake Bay Foundation v.</u>
            <u>Gwaltney</u>, 844 F.2d 170, 171-72 (4th Cir.1988), on remand from
9           108 S.Ct. 376 (1987). We also agree with the Fourth Circuit's
            definition of what may constitute a continuing likelihood of
10          violations. "Intermittent or sporadic violations do not cease to be
            ongoing until the date when there is no real likelihood of
11          repetition." <u>Id</u>. at 172 (emphasis added).

12  <u>Sierra Club v. Union Oil Co.</u>, 853 F.2d 667, 671 (9th Cir. 1988).

13          There is no dispute of fact that Callaway violated the Act after the filing of the

14  initial complaint.  Callaway concedes he operated the facility between July 13, 2010, when the

15  original complaint was filed, and November 19, 2010.  The McGregor affidavit states that

16  sometime after April 1, 2012, when he operated from the subject property, he removed the

17  "concrete batch plant, conveyors and other equipment" that Callaway had left on the property for

18  manufacturing concrete.  (McGregor Aff. ¶¶ 6, 8.)  Furthermore, the Requests for Admissions,

19  having been deemed admitted, establish that Callaway was in violation from May 14, 2005 until

20  "the present," which term can be construed in a number of ways: as the date the RFAs were

21  served, the date Callaway did not respond to them, the date they were deemed admitted by the

22  May 31, 2012 order, or today.  <u>See</u> e.g. RFA number 13 ("[t]hat at any time between May 14,

23  2005 and the present, samples of STORM WATER discharged from the FACILITY contained a

24  pH level either below a pH level of 6.0 or in excess of a pH level of 9.0.")

25          Pursuant to <u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.</u>, 484

26  U.S. 49, 63, 108 S.Ct. 376, 384 (1987), plaintiff has established that Callaway has violated the

16

1  CWA with continuous and/or intermittent violations that are not wholly past violations.  A

2  citizen may bring an action against a person in violation, "whether the violation be a continuous

3  one, or an occasional or sporadic one."  Id. (citing one of authors of the bill, Senator Muskie,

4  from the Congressional Record).

5          The exact date that Callaway ceased violations, or the number of times of the

6  violations is not at issue in this motion, and will not be decided by these findings and

7  recommendations, which address liability only, and not the remedy, which issue is reserved for

8  trial.  Based on this evidence, CalSpa has established that Callaway was in violation after the

9  date the complaint was filed.  Callaway urges that the second factor listed above be considered

10  instead of the date of the filing of the complaint, based on his termination of operations in

11  November, 2010.  Authority is clear that ongoing violations may be proved by either factor listed

12  above.  Therefore, Callaway should be denied summary judgment on this issue.

13          C.  Causation

14          Callaway argues that CalSpa has not shown a nexus between the pollutant

15  allegedly being discharged into Honey Run Creek and the pollutant actually found in this creek.

16  This issue was already determined in CalSpa's favor, however, when Request for Admission

17  Number 2 was deemed admitted.  That RFA sought an admission that storm water flowing from

18  the Facility is discharged to "navigable waters."  See Order, filed May 31, 2012, at 5:17-18.  This

19  fact was conclusively established when this RFA and others were deemed admitted by this order.

20  In addition, most of the remaining RFAs deemed admitted by the court establish that pollutants

21  were discharged from Callaway's Facility into navigable waters.  See e.g. RFA number 3 ("storm

22  water associated with industrial activity is discharged from the facility"), RFA number 11

23  (between May, 2005 and the present, samples of storm water from the Facility revealed total

24  suspended solids in concentrations greater than 100 mg/L).

25          In addition to these RFAs, CalSpa's storm water consultant submitted a

26  declaration after testing storm water samples, establishing that as of the date of testing, February

17

29, 2012, it was his professional opinion that "Defendant's polluted discharges of storm water from the Facility to waters of the United States and violations of the Clean Water Act and the General Permit are ongoing and continuing..." (Dkt. no. 64, Lane Decl., ¶ 15.)  Further evidence is found in the Notice of Violation by the California Regional Water Quality Control Board, dated July 20, 2005, in which the Board informed defendant of its findings based on its inspection of March 24, 2005.  Defendant was found to be in violation for failing to furnish a Storm Water Pollution Prevention Plan, failing to implement and maintain appropriate BMPs, and failing to furnish a complete Monitoring Plan and Annual Report. (Dkt. no. 94-7, Roper Decl., Ex. J.)  The Board concluded by informing defendant that these violations, as well as defendant's discharge of pollutants into surface waters, exposed him to further enforcement action.  (Id.)

The undisputed evidence set forth above requires a recommendation that Callaway's motion for summary judgment be denied in its entirety.

V.  CalSpa's Motion for Partial Summary Judgment[78]

A.  Whether Callaway Has Failed to Implement BAT/BCT to Control or Eliminate Pollutants (Claim Three)

CalSpa presents six facts in support of its motion on its third claim that Callaway violated the General Permit and CWA by discharging pollutants without using the BAT and the BCT requirements:

> (1) the Regional Board's determination as set forth in its Notice of Violation addressed to the operators of the Facility on July 20, 2005, that the Facility's operators had failed to develop, implement and maintain appropriate storm water BMPs at the Facility (Fact

---

[7]  Callaway did not file an opposition to CalSpa's motion; however, since he was proceeding in pro se at the time that briefing was due, the court will construe his motion for summary judgment as an opposition to CalSpa's motion to the extent that addresses issues raised by CalSpa's motion.

[8]  CalSpa's standing argument was addressed in full, *supra*, in the discussion relating to the same issue raised in Callaway's motion.

1          51);

2                 (2) the Regional Board's determination as set forth in its letter
          addressed to the operators of the Facility on December 15, 2009,
3          that "[t]he levels of pollutants in your storm water samples indicate
          that the current BMPs implemented at your site are not sufficient to
4          reduce pollutant concentrations below benchmark levels" (Fact
          52);
5
                 (3) the previously filed declaration of CSPA's storm water
6          consultant, Professor John Lane, who inspected the Facility from
          just outside its borders on February 29, 2012, and observed "the
7          absence of any structural controls needed to properly manage storm
          water…." (Fact 53; ECF No. 64 at ¶ 13);
8
                 (4) CSPA's Request for Admission No. 16, which having been
9          deemed admitted by the Court, establishes that the storm water
          pollution management practices or treatment technologies
10         implemented by Defendant at the Facility are the only storm water
          pollution management practices or treatment technologies that
11         have been considered by Defendant for implementation at the
          Facility (Fact 54);
12
                 (5) CSPA's Request for Admission No. 11, which having been
13         deemed admitted by the Court, establishes that storm water
          containing total suspended solids in excess of the EPA benchmark
14         has discharged from the Facility during storm events occurring
          from May 14, 2005 through the present (Fact 48); and,
15
                 (6) CSPA's Request for Admission No. 13, which having been
16         deemed admitted by the Court, establishes that storm water
          containing a pH level outside the range of the EPA benchmark has
17         discharged from the Facility during storm events occurring from
          May 14, 2005 through the present (Fact 49).
18

19    (Dkt. no. 93-1 at 24.)

20            CalSpa cites to <u>Santa Monica BayKeeper v. SunLite Salvage</u>, Case no. Civ.99-

21    4578 WDK (C.D. Cal. 1999), which held that "[c]ompliance with the BAT requirement is

22    determined by demonstrating that pollutant concentrations in storm water discharges are below

23    the 'benchmark levels' set out by EPA. 60 Fed. Reg. 50824, Sept. 29, 1995." (RJN, Ex. D).

24    CalSpa also cites <u>Ecological Rights Foundation v. Sierra Pacific Industries</u>, No. C-01-0520 MEJ

25    (N.D. Cal. 2002), wherein the court granted summary judgment where storm water sampling

26    results showed that benchmarks established by the EPA were exceeded, and thus the facility did

1   not meet the BAT/BCT standard required by the General Permit.  (RJN, Ex. C).

2          CalSpa's evidence establishes that Callaway is in violation of Claim Three, which

3   alleges that defendant failed to develop and implement the BAT and BCT to reduce or prevent

4   pollutants in the storm water discharges, in violation of the General Permit and the Clean Water

5   Act.  (FAC ¶¶ 61-64.)  As set forth above, the Regional Board's Notice of Violation is

6   undisputed and establishes for purposes of this motion that Callaway had failed to implement and

7   maintain appropriate BMPs that meet the BAT/BCT standard as of the date of that notice, July

8   20, 2005.  (Roper Decl., Ex. J; RJN Ex. A.)  On December 15, 2009, the Regional Board's letter,

9   which is also undisputed, informed defendant that the Facility "exceeded US EPA benchmark

10  values for certain parameters," and that BMPs at the site did not adequately reduce pollutants.

11  (Id., Ex. H.)

12          The report of CalSpa's consultant, dated February 29, 2012, also establishes "the

13  absence of any structural controls needed to properly manage storm water flows and large piles

14  of concrete waste that were not in compliance with the Clean Water Act."  (Dkt. no. 64, Lane

15  Decl., ¶ 13.)

16          Furthermore, RFAs 16, 11 and 13 establish that Callaway's storm water pollution

17  management practices or treatment technologies implemented by Callaway were the only ones

18  considered by him for the Facility, and that between May 14, 2005 and the present, storm water

19  samples discharged from the Facility contained total suspended solids in concentrations greater

20  than 100 mg/L, and pH levels either below 6.0 or above 9.0.  (Roper Decl., Ex. D.)  The court

21  has taken judicial notice of cases holding that measurements which are outside the benchmarks

22  are conclusive evidence that the discharger is not in compliance with the BAT and BCT

23  requirements of the EPA and the General Permit.  (RJN Exs. C, D.)  The General Permit required

24  that where there are exceedances of pollution discharge benchmarks, the operator of the Facility

25  is required to implement new BMPs to reduce or eliminate pollutants.  (RJN, Ex. A.)

26  \\\\\

1    Consequently, the evidence shows that Callaway did not implement BMPs that

2    met the BAT/BCT standard required under the General Permit, and summary judgment should be

3    granted on Claim Three.

4    Although this claim alleges that Callaway has been in violation every day since

5    May 14, 2005, the court finds such at present for purposes of liability only.  Later adjudication of

6    the remedies portion of this case will examine the number of days of Callaway's non-compliance

7    in terms of the degree to which such liability may be recompensed, or other remedies imposed.

8    B.  Whether Callaway Violated the General Permit's Monitoring and Reporting

9    Requirements by Failing to Analyze Storm Water Samples for Iron (Claim Four)

10    In regard to Claim Four, CalSpa contends that Callaway violated the General

11    Permit because he did not analyze his Facility's storm water samples for iron.  See RJN, Ex. A,

12    General Permit at 27, Section B(5)(c)(ii) and (iii), Table D at 42, dkt. no. 95-1 at 58.  Since

13    Callaway's Facility falls within the category of Concrete, Gypsum and Plaster Products (SIC

14    Code 327X in Table D), its storm water samples must be tested for iron, as well as other

15    pollutants.  CalSpa refers to its RFA Number 5, which was deemed admitted and states that the

16    Facility falls within the Standard Industrial Classification Code for "Ready-mixed Concrete," i.e.

17    SIC Code 3273.  (Dkt. no. 94, Roper Decl., Ex. D.)  To the extent that Callaway's counsel

18    attempts to make an evidentiary objection to the admission of these reports, it is overruled as the

19    RFAs to which the reports are connected have been deemed admitted by court order.  The court

20    has reviewed the Annual Reports which have been deemed admitted pursuant to RFAs numbered

21    19 through 22 and state that each exhibit attached to each of these RFAs is a true and correct

22    copy of Callaway's Annual Report for the years 2004-2005, 2005-2006, 2006-2007, and 2007-

23    2008.  (Id.)  These reports verify CalSpa's claim that Callaway never analyzed storm water

24    discharges for the presence of iron during the aforementioned years.  Based on this evidence,

25    CalSpa should be granted summary judgment on Claim Four.

26    \\\\\

C.  Whether Callaway has Permitted Polluted Non-Storm Water to Discharge From the Facility in Violation of the General Permit (Claim Six)

In regard to its sixth claim, CalSpa correctly argues that its RFA Number 14 establishes that unauthorized non-storm water is discharged from the facility, in violation of the General Permit.  Non-storm water is water that discharges as a result of "rinsing or washing of vehicles, equipment, buildings or pavement; materials that have been improperly disposed of or dumped, and spilled; or leaked materials."  (RJN, Ex. A, General Permit at IX.)  The General Permit prohibits such discharge. (Id. at 3, Prohibition A.1.)

As RFA number 14 has been deemed admitted, CalSpa should be granted summary judgment on Claim Six.

CONCLUSION

IT IS HEREBY RECOMMENDED that:

1.  Callaway's motion for summary judgment, filed August 16, 2012, (dkt. no. 87), be denied; and

2.  CalSpa's motion for partial summary judgment, filed September 20, 2012, (dkt. no. 93), be granted as to Claims Three, Four and Six.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.  The

\\\\\

\\\\\

\\\\\

\\\\\

1  parties are advised that failure to file objections within the specified time may waive the right to

2  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: November 27, 2012

4

5                              <u>/s/ Gregory G. Hollows</u>
                         UNITED STATES MAGISTRATE JUDGE

6

7

8  GGH:076/CSPA1801.msj.wpd

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26